THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JAMES TIMMONS, Defendant-Appellant.
Third District   No. 82—630

Opinion filed May 26, 1983.

Robert Agostinelli and Verlin R. F. Meinz, both of State Appellate Defender's Office, of Ottawa, for appellant.

Joan C. Scott, State's Attorney, of Lewistown (John X. Breslin and Gerry R. Arnold, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE ALLOY delivered the opinion of the court:

James Timmons appeals from his conviction for the unlawful delivery of a controlled substance, less than 30 grams of LSD. Following a jury trial, in which the defendant was found guilty, the trial judge sentenced him to a term of 30 months' probation, conditioned upon the payment of a $600 fine, court costs of $105.40, and a surcharge of $60. From the conviction, and the imposition of the surcharge, he appeals. The defense contends that reversal is required: (1) because the State was permitted to cross-examine the defendant regarding his post-arrest failure to communicate his trial-testimony claim of innocence; (2) because defense counsel was not permitted to bring forth that a key prosecution witness had refused to be interviewed by the defense prior to trial. The defendant also argues that he was not proven guilty beyond a reasonable doubt. The final issue raised is whether the court's order assessing the defendant a penalty assessment surcharge in the amount of $60 was in error.

The record establishes that the State's evidence consisted principally of the testimony of Donna Kurlinkus, an undercover MEG agent. Her testimony was that at about 6:15 p.m., on March 11, 1981, she and Joe Bricker were riding in her vehicle. They drove to a large green house in Banner, Illinois, into which they were admitted by the defendant Timmons. Timmons and agent Kurlinkus conversed about some "acid" (lysergic acid diethylamide) she "had heard he had." According to Kurlinkus, Timmons informed her that he only had one "hit" (unit) left, and he gave her a small piece of paper with blue edging. She put it in her pocket and later left. It was determined subse-

quently that the piece of paper contained LSD.

The other State's witness was William Maddox, a Pekin police officer, who had been assigned to the MEG unit. Maddox, on the basis of Kurlinkus' evidence, had executed an arrest warrant for the defendant, at Timmons' home in Banner, in January 1982. The arrest occurred almost nine months after the sale to Kurlinkus. Maddox testified that he went to Timmons' home, arrested him, advised him of his rights, and then transported him to the Fulton County jail by automobile. During the trip to Canton, the two conversed, with Maddox outlining the "general specifics" of the case. According to Maddox, the defendant denied ever selling acid to anyone. Maddox did indicate, however, that when asked about the acid, Timmons stated that he remembered getting it in a bar in Mapleton, but did not recall any girl. He denied throughout the conversation with Maddox any sale or transfer to Kurlinkus.

The defense witnesses were numerous. The defendant testified in his own behalf, indicating that on the day of the alleged sale, March 11, 1981, he was home with a friend until about 6:30 p.m., when he left for the bowling alley. He stated that neither Joe Bricker nor Donna Kurlinkus came by the house while he was there. Timmons admitted trying acid once, stating that he purchased it at a bar in Mapleton, sometime around Christmas 1980. Timmons recalled being arrested by Maddox, in January 1982, and riding with him to the jail. Timmons testified that he told Maddox that agent Kurlinkus had not been to his home and also that he had not given her any acid. He told Maddox that he had seen acid in a bar in Mapleton around Christmas time. He repeatedly denied any involvement in the incident.

In the State's cross-examination of the defendant, the prosecutor inquired how it was that the defendant could be so positive about his whereabouts on the day of the alleged sale to Kurlinkus. In response, Timmons detailed how, after his arrest, through subsequent conversations with his wife, he was able to specify his whereabouts and activities on March 11, 1981. Timmons indicated that his wife reminded him that March 11 was her sister's birthday and that there had been a family birthday party that day. The prosecutor then asked the defendant whether he didn't think it wise to tell the information to authorities before trial, and questioned why he had waited until trial to come forth with the testimony. Timmons responded that his lawyer was in charge of his case, after the arrest, and that he informed the lawyer of the matters. The defense objected to the prosecution's cross-examination concerning the defendant's post-arrest failure to talk to the police about his whereabouts on the day of the alleged

sale. The trial court, finding that the defense had opened the door for such testimony, denied the motion to strike.

Other defense testimony corroborated the defendant's testimony as to his whereabouts and events of that day. Tim Seward, the friend who had allegedly been with Timmons all that day, stated that he had been with him until 6:30 p.m., when he left for the bowling alley. Seward testified that Joe Bricker, whom they both knew and whom Kurlinkus said was with her, did not come by Timmons' house that day. Mrs. Timmons also testified that Bricker did not come by, and she contradicted another of Kurlinkus' statements. Kurlinkus testified that there was a woman at the house, doing laundry, with children about, on the day of the sale. Mrs. Timmons stated that during that period of time she had no washer at home, and she did the laundry away from the home. Joe Bricker also testified for the defense, denying that he was with Officer Kurlinkus and denying ever going to the defendant's house with Kurlinkus. On cross-examination, Bricker admitted that he had formerly lived with the defendant and still bowled with him on occasion. Numerous other witnesses confirmed Bricker's testimony as to his whereabouts on that day, and the fact that he was not with Kurlinkus.

The only rebuttal testimony was from Officer Kurlinkus, who on direct had testified that Timmons' house was green, whereas the Timmons' house was white. Kurlinkus indicated that while jogging the morning of the trial she had noticed that the house was white, but had a dark green garage door.

The jury returned a guilty verdict and the court sentenced the defendant to a term of 30-months probation, with a fine of $600 and court costs. Later, the formal sentencing order required the defendant to pay the fine, costs, and an additional surcharge in the amount of $60. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—9—1(c).) The notice of appeal was thereafter filed.

■ The first issue is whether reversible error was committed in the court's permitting the prosecution to cross-examine the defendant concerning his post-trial failure to communicate to them his trial testimony claim of innocence. In cross-examining the defendant, the prosecutor had Timmons reconstruct the process by which his wife and he were able to remember his actions and the events of March 11, 1981, the day of the alleged sale. Timmons testified on direct that he remembered the events of that day because his wife reminded him that it was the day of his sister-in-law's birthday party, which he had missed while bowling. During the cross-examination, the prosecutor stated:

"Q. After you talked to your wife, you didn't think it wise to come and tell the police authorities about this or the State's Attorney's Office; rather, you waited to come to Court today to tell us this?

A. Why should I go to the State's Attorney's when they are trying to—they arrested me. I am supposed to talk to my lawyer, not a State's Attorney.

Q. You wouldn't want to, since the State's Attorney's Office is the one that's charging you and the one that is accusing you of this crime. You wouldn't want to tell them that there's more indication here that would indicate that you were not involved?''

Defense objection was made to this attempted impeachment through evidence that Timmons had not gone to the State to inform them of his newly recollected information concerning his activities on the day of the alleged sale. The trial court initially ruled that the question was proper since the subject had been opened during the direct examination of the defendant in questions concerning his representation by an attorney. However, the subject of the defendant's discussions with his lawyer was not addressed by defense counsel until redirect. The trial court's basis for admitting the questioning, faced with the defense post-trial motion, was that the defendant had not remained totally silent following his arrest. The court also concluded that if there was error, it was harmless.

The touchstone of any inquiry into errors concerning cross-examination of a defendant about his failure to make a post-arrest statement of innocence is *United States v. Hale* (1975), 422 U.S. 171, 45 L. Ed. 2d 99, 95 S. Ct. 2133, wherein it was held error for the State to cross-examine a defendant about his post-arrest silence, even faced with his testimony of innocence at trial. In that case, the court noted that absent a "threshold inconsistency" between the post-arrest silence and the trial testimony, it was error to permit such cross-examination. (422 U.S. 171, 176, 45 L. Ed. 2d 99, 104, 95 S. Ct. 2133, 2136.) While *Hale* and its illustrious progeny (*Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240) involved post-arrest silence, the principles of those cases have been applied in situations where the defendant has been only partially silent after arrest. The crucial inquiry remains whether there is a threshold inconsistency between the defendant's post-arrest silence and his subsequent trial testimony. (*People v. Rehbein* (1978), 74 Ill. 2d 435, 386 N.E.2d 39, *cert. denied* (1979), 442 U.S. 919, 61 L. Ed. 2d 287, 99 S. Ct. 2843; *People v. Green* (1979), 74 Ill. 2d 444, 386 N.E.2d 272; *People v. Beller*

(1979), 74 Ill. 2d 514, 386 N.E.2d 857.) In *Rehbein*, the court permitted cross-examination of a defendant concerning his failure to communicate his consent defense to police at the time of his arrest. In so doing, the court noted that the consent defense was obviously inconsistent with the statements given police after arrest, to the effect that his car was inoperable and that he had been home all night. Under the circumstances, the court found no error in bringing forth the fact that the defendant had not advanced the consent defense in his discussions with the police after arrest. In *Green*, however, the court found error in such cross-examination where the defendant's trial testimony was not inconsistent with the statements given at the time of his arrest. At trial, the defendant stated that he entered the building only to find shelter for his family, while he told the police that there was one other man in the house and that no car was involved. The court noted that even though there was some inconsistency concerning the involvement of a car, that inconsistency did not impeach, through its inconsistency, the defendant's shelter defense offered at trial. The inconsistency was collateral to the subject of improper cross, that being the defendant's failure to advise the police of his defense. In *Beller*, the court found error in the prosecutor's comment about the defendant's failure to advance his claim of innocence at the time of his arrest. In analyzing the situation therein, the court found that where the question of inconsistency is ambiguous, then the requisite manifest inconsistency is not established, and the prosecutor is precluded from cross-examining or commenting about a defendant's failure to advance his claim of innocence. The court in *Green* and *Beller*, while finding error, found such error to have been harmless under the circumstances of the cases.

In the instant case, the defendant's trial testimony was that he did not deliver drugs to Kurlinkus on March 11, 1981. He testified to his activities and whereabouts on that day, in support of his testimony that Kurlinkus had not stopped by the house. The prosecutor then cross-examined him upon his failure to talk with the police or the State's Attorney about his whereabouts and activities on the day of the alleged sale. Yet, this trial testimony was not inconsistent, as regards his whereabouts and activities on the day of the alleged sale, with his post-arrest statements to Officer Maddox. The record is clear that in talking with Maddox the defendant denied committing the offense and denied any involvement with Kurlinkus or any other girl. He denied any delivery of LSD. Thus, his post-arrest statements are consistent with his trial testimony as regards this area. The trial testimony merely filled in the details as to his whereabouts and activities

on the day. There was no threshold inconsistency between his trial testimony about what he did that day and his post-arrest statements, indicating that he did not sell the drugs to Kurlinkus. The State's emphasis upon Maddox' testimony about the defendant's statements referring to obtaining LSD in a bar in Mapleton is misplaced. Even granting, *arguendo*, an inconsistency, which only arises if the benefit of construing the ambiguity is given the State, nevertheless such inconsistency does not impeach his trial testimony concerning his activities and whereabouts on the day of the alleged sale and his consistent denial of any sale. It was upon his testimony concerning his activities on March 11 that the cross-examination inquiry into why he had not communicated with the police or State's Attorney took place. The cross was not directed to the above-suggested inconsistency as to LSD in a bar in Mapleton, but to an alleged, but nonexistent, inconsistency between his post-arrest statements and his testimony as to his whereabouts and activities on the day of the alleged sale. The cross-examination, since no threshold inconsistency existed, was error. *People v. Green; People v. Beller*.

That does not end the matter, for the State asserts that the trial court correctly concluded that any error was harmless beyond a reasonable doubt. We disagree. Unlike the cases in *Green* and *Beller*, the State's case herein was not overwhelming. Here, the only evidence of a sale was the testimony of Donna Kurlinkus, which testimony was somewhat inaccurate, the color of the house, and directly contradicted by a number of defense witnesses. Both the defendant Timmons and Joe Bricker, who Kurlinkus stated was with her at the time of the sale, denied the incident took place and both were corroborated by other witnesses. Credibility, both Kurlinkus' and the defendant's, was a crucial factor, and the evidence presented a close question. Given this, we are unable to conclude that the error in commenting upon the defendant's failure to go to the authorities with the information concerning his activities and whereabouts on March 11, a comment implying his testimony was recently fabricated, was harmless beyond a reasonable doubt. Therefore, the cause must be reversed and remanded for retrial.

■■ Another error asserted by the defense is the court's refusal to permit defense counsel to impeach Officer Kurlinkus by showing that she refused to speak with him about the case before trial. Objection to such inquiry was sustained, and the defense offer of proof indicated that Kurlinkus had received a letter from defendant's counsel requesting a pretrial interview and that she had refused to discuss the case after consulting with the prosecutor's office. The defense urges

that the refusal of the prosecution witness to talk with defense counsel, upon request, was a proper subject for impeachment cross-examination. At the outset we are met with the State's contention that the issue has been waived by failure to include it in the post-trial motion. Although the issue was not raised in the post-trial motion, and could be considered waived on that basis, the circumstances herein weigh toward relaxation of the waiver rule, for the court, during trial, was given opportunity to consider and correct any error in refusing the impeachment cross-examination. (*People v. Gillman* (1980), 91 Ill. App. 3d 53, 59, 414 N.E.2d 240.) Here the defense attempted the cross-examination concerning a refusal to discuss the case when Kurlinkus was called by the State, and when objection was sustained, defense counsel later called Kurlinkus in his case in chief, for the purpose of making the inquiry. Objection was again sustained and the offer of proof followed. The policy underlying the waiver rule was satisfied and we find merit in the defense position. In so finding, we rely on the decision and analysis by the court in *People v. VanZile* (1977), 48 Ill. App. 3d 972, 976-79, 363 N.E.2d 424. The court stated, in pertinent part:

"The credibility of a witness is always an issue—more correctly, *in* issue. A refusal to talk in advance of trial to the other side reasonably *could* indicate hostility by the witness to the inquiring side, or at least a bias for, or an interest in, a favorable outcome for the side calling him. We say 'could' because triers of the fact need not invariably so conclude, but they reasonably can do so. And if triers of the fact can reasonably infer this, then we do not have forbidden impeachment on a collateral matter, but rather on a very germane matter: the credibility of that witness. ***

Under our present system of liberal discovery, both sides at a minimum know the witnesses who will oppose them. Admittedly, both sides have the right to attempt to interview the other's witnesses. Admittedly too, witnesses have a corollary right not to be interviewed if they so choose. But this refusal, in our opinion, can be used against them to argue bias, hostility, interest in outcome, all of which look to credibility. It is a risk the witness or his side takes. That these are reasonable inferences from such conduct cannot be gainsaid. Although they are not inexorable, they are reasonable. It is up to the trier of fact to accept or reject them. ***

*** We may be crossing a threshold, but it seems to us that when one is asked to be interviewed on what his testimony will

be, he declines at the risk that he may be asked later on at trial about such fact and his reasons therefor. It is a risk he takes. Perhaps it can be explained away, but it is nonetheless still a risk. Again, the lack of cases is a puzzlement. We think it is proper to bring out on cross-examination the fact that the witness has refused to talk to the examiner's side of the case where a fifth amendment privilege against self-incrimination of that witness is not relevant." (48 Ill. App. 3d 972, 977-78, 363 N.E.2d 424.)

We believe that the *VanZile* court's position is well reasoned and sound, and we adopt it. While such rule necessarily reduces, to some extent, the usual discretion of the trial court regarding the breadth of cross-examination (*People v. Peter* (1973), 55 Ill. 2d 443, 451, 303 N.E.2d 398, *cert. denied* (1974), 417 U.S. 920, 41 L. Ed. 2d 225, 94 S. Ct. 2627), it is consistent with the trend toward more open criminal discovery (*People v. Glover* (1971), 49 Ill. 2d 78, 273 N.E.2d 367; 87 Ill. 2d R. 415(a)). While we need not determine whether the failure to permit such cross-examination in the instant case was reversible error by itself, we do note that the credibility of the State's witness was in issue and of crucial importance in this case. Upon remandment for a new trial, defense counsel should be permitted to cross-examine Officer Kurlinkus concerning her refusal to discuss the case with him.

■ The defense next contends that this court should find that the defendant was not proven guilty beyond a reasonable doubt, when the errors above discussed are taken into consideration. We disagree. This case revolves around the credibility of the witnesses, for both sides. It is established that a reviewing court will not substitute its judgment for the factfinder's on questions of the weight of evidence and the credibility of witnesses. (*People v. Mills* (1968), 40 Ill. 2d 4, 237 N.E.2d 697; *People v. O'Connol* (1981), 98 Ill. App. 3d 625, 424 N.E.2d 930.) In reviewing the record, we must view the evidence in the light most favorable to the prosecution, in assessing whether the defendant was proven guilty beyond a reasonable doubt. (*People v. Kirwan* (1981), 96 Ill. App. 3d 121, 421 N.E.2d 317.) Here, Officer Kurlinkus' testimony was sufficient, if believed, even taking into consideration additional impeachment matter shown by the offer of proof, for the jury to conclude beyond a reasonable doubt that the defendant was guilty of the crime charged. The case, because of the aforementioned errors, will be reversed and remanded for another trial.

■ The final issue is whether the court erred in assessing the defendant an additional $60 surcharge after conviction, based upon section 5—9—1 of the Unified Code of Corrections (Ill. Rev. Stat.

1981, ch. 38, par. 1005—9—1(c)). That provision, which became effective January 1, 1982, states:

"(c) Every fine imposed in sentencing for a criminal or traffic offense, except an offense relating to parking or registration, or offense by a pedestrian, shall include an amount payable to the Traffic and Criminal Conviction Surcharge Fund of the State Treasury in accordance with the following table:
* * *

Such amounts payable to such fund shall be assessed by the court imposing the fine and shall be collected by the Circuit Clerk in addition to the fine and costs in the case. The Circuit Clerk shall distribute such amount collected on behalf of the Traffic and Criminal Conviction Surcharge Fund in accordance with the provision of Section 9.1 of the 'Illinois Police Training Act.' "

Section 9.1 of the Illinois Police Training Act (Ill. Rev. Stat. 1981, ch. 85, par. 509.1) reads, in pertinent part:

"In addition to every fine imposed by a court for a criminal or traffic offense, an additional assessment, payable to The Traffic and Criminal Conviction Surcharge Fund, shall be imposed by the court and paid by the defendant in accordance with the schedule provided in subsection (c) of Section 5—9—1 of the 'Unified Code of Corrections'. [Sic] In the county where such fine is imposed, the Clerk of the Circuit Court shall collect the same and transmit it to the county treasurer. The County Treasurer of each county shall pay over to the State Treasurer the *penalty assessment* collected herein between the 15th of May and the first of June of each year, to be paid into The Traffic and Criminal Conviction Surcharge Fund of the State Treasury, less 2% of such *penalty assessment* total, which 2% shall be paid by the County Treasurer to the circuit court clerk to cover the costs incurred in administering and enforcing this Section. The County Treasurer of each County shall report quarterly to the Board the amount of penalties deposited with him during the preceding quarter." (Emphasis added.)

The defendant notes that his alleged criminal act of sale occurred on March 11, 1981, while the above provisions for penalty assessment became effective January 1, 1982. He finds application of the provisions to him as violative of the ban against *ex post facto* laws. (U.S. Const., art. I, sec. 10; Ill. Const. 1970, art. I, sec. 16.) As we have stated, these provisions preclude increasing the punishment for an offense by an amendatory enactment taking place after the offense has been

committed. (*People v. Bowling* (1976), 43 Ill. App. 3d 932, 357 N.E.2d 724.) The State, quite understandably, argues that ban against *ex post facto* laws applies only to laws that are punitive in nature, and that it does not apply to costs, which are compensatory, not punitive. (*People v. DuMontelle* (1977), 49 Ill. App. 3d 187, 364 N.E.2d 95, *rev'd on other grounds* (1978), 71 Ill. 2d 157.) From these accepted rules, the State then argues that the assessment under the above provisions merely imposes a surcharge to cover the costs of the proceedings. By the terms of the enacting legislation, above set forth, this charge is not a surcharge covering the costs of the proceeding. The charge is to be collected, in addition "to the fine and costs in the case," and is not included within the fine. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—9—1(c).) Furthermore, it is specifically denoted as a "penalty assessment" in section 9.2 of the Illinois Police Training Act (Ill. Rev. Stat. 1981, ch. 85, par. 509.1). The intent and effect of these provisions was punitive in nature, and as such, application to the defendant, whose alleged offense was committed prior to their effectiveness, was in error, as contrary to the prohibition against *ex post facto* laws. If upon retrial, the defendant is again convicted, the court may not impose the penalty assessment called for by these provisions.

The case is reversed and remanded for another trial.

Reversed and remanded for retrial.

SCOTT and BARRY, JJ., concur.