THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARK CADWALLADER, Defendant-Appellant.

Fourth District   No. 4—88—0364

Opinion filed March 31, 1989.

Daniel D. Yuhas and Arden J. Lang, both of State Appellate Defender's Office, of Springfield, for appellant.

Brett Irving, State's Attorney, of Pittsfield (Kenneth R. Boyle, Robert J. Biderman, and Rebecca L. White, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KNECHT delivered the opinion of the court:

A Pike County information charged that on or about July 31, 1987, defendant Mark Cadwallader committed the offenses of residential burglary of the dwelling place of Gary Drebes (Drebes) (Ill. Rev. Stat. 1985, ch. 38, par. 19—3), burglary of a building belonging to Drebes (a garage) (Ill. Rev. Stat. 1985, ch. 38, par. 19—1(a)), and theft of Drebes' property valued in excess of $300 (Ill. Rev. Stat. 1985, ch. 38, par. 16—1(a)(1)). The case was tried to a jury on March 21, 1988, and defendant was found guilty as charged. The trial court sentenced defendant to four years' imprisonment in the Department of Corrections. Defendant appeals, contending he was not proved guilty beyond a reasonable doubt and it was error for the jury to deliberate without the benefit of written instructions. We reverse.

The chief prosecution witnesses were Billy Hart and Lee Robbins,

who admittedly took part in the crimes with which defendant was charged. Hart, age 17, gave the following testimony. On July 30 or 31, 1987, Hart, Lee Robbins, and the defendant broke into Drebes' residence and garage and stole various items. The afternoon of the break-in, Hart picked up defendant around 4 p.m. at his home in Hull, Illinois. Hart could not remember exactly what they did thereafter, but he thought they drove to Hannibal. Around 10 p.m., Hart and defendant picked up Lee Robbins and drove to Drebes' residence. After parking the car, Hart and Robbins walked two-tenths of a mile to the house and retrieved the house and garage keys from a light post. Defendant remained in the car drinking beer. Hart unlocked the garage and he and Robbins took some tools and a five-gallon jug of gasoline. The boys carried what they could to the car and told defendant they needed help with the rest. Defendant helped them carry the remaining items to the trunk of the car. Hart and Robbins then went back to the house. When they were sure no one was home, they returned to the car and parked it behind the house. Hart unlocked the house and he and Robbins entered while defendant kept watch outside. Hart and Robbins carried a shotgun, cigarettes, a lamp, a trumpet, and a jewelry box from the house to the car and defendant helped them load the items in the backseat. Defendant did not enter the garage or the house. Robbins locked the garage, Hart locked the house and Robbins replaced the keys on the light post.

Hart estimated they left Drebes' residence around 11 p.m. and drove to a nearby field. They filled the car with the stolen gas and set the can on fire. Some jewelry was saved, but they threw away the jewelry box. Thereafter, they drove to Quincy to sell some of the stolen merchandise, but their buyer, David Will, could not be found. Hart dropped defendant off at his house in Hull, and Robbins and defendant spent the night at Hart's house in New Canton. Hart kept the lamp and cigarettes for himself. The next day around 2 p.m., Hart and defendant went to Quincy and sold the gun, lamp, trumpet, and tools to David Will. Hart and defendant split the money.

On cross-examination Hart said he had known defendant for about one year and saw him on a daily basis. Hart said defendant knew the boys planned to break into Drebes' house while he and his family were on vacation. Hart said Robbins was a friend of one of Drebes' children. Consequently, Robbins knew where the family kept the keys to their house and garage. Hart testified he had been in Drebes' residence without defendant on a prior occasion one week earlier. At that time Hart entered the residence and stole a pistol. Hart pleaded guilty to the latter offense.

Hart also admitted he gave a written statement to the police regarding the break-in at Drebes' residence. In the written statement, Hart said he drove to Quincy immediately after the break-in and sold the stolen items to David Will for $75. Hart indicated he gave defendant $20. By contrast, Hart testified at trial the trip to Quincy was made the day after the break-in. Hart said he initially gave a false statement to the police because he was trying to protect defendant.

Finally, Hart testified he was charged with the Drebes break-in and other crimes, pleaded guilty, and received two years' of juvenile probation. A condition of Hart's probation was that he would testify truthfully at any further proceeding, pay restitution and abide by a curfew.

Lee Edward Robbins, also age 17, recounted the following events. On or about July 31, 1987, Hart and defendant picked him up at home around 9:30 p.m. Hart drove them to Drebes' residence. After Hart parked the car, he and Robbins walked up to the house. Robbins showed Hart where the keys to the house and garage were hidden. Robbins gave the key to Hart and he opened the garage. Defendant remained in the car. Hart told Robbins to go get defendant, and the three men carried the gasoline and tools to the car. They then got into the car and drove it up to the house. Defendant said he would stay in the car as a lookout. Hart unlocked the door and he and Robbins went in. Robbins took the jewelry box, and Hart carried the gun, lantern, trumpet, and cigarettes to the car. Defendant did not enter the house except to tell the two boys to hurry up.

After locking all the doors and disposing of the gas can, Robbins, Hart, and defendant drove to Quincy. On the way back to Hull, defendant threw the jewelry box out of the window onto a gravel road near a creek. Hart and Robbins dropped defendant off in Hull and Robbins spent the night with Hart.

Robbins admitted he had been charged in this case, but was awarded juvenile probation, a curfew, and ordered to pay restitution. Robbins also agreed to testify truthfully at further related proceedings. On cross-examination Robbins said he, Hart, and defendant agreed to break into Drebes' house while en route. He believed the break-in was complete by 10:15 p.m. Robbins also admitted he included false facts in a written, but nonsworn, statement to the police. Robbins' statement falsely reported defendant entered and removed items from Drebes' house.

Gary Drebes testified for the State that he and his family were on vacation from July 24, 1987, to August 2, 1987. His house and garage in rural Hull, Illinois, were locked when the family returned on Au-

gust 2. Later that day, Mrs. Drebes discovered a jewelry box missing from a downstairs bedroom. A shotgun, antique lamp, and trumpet were among other items missing from the house. A toolbox and tools, a gasoline can, and gasoline were absent from the garage. Drebes estimated his total loss at around $1,000.

On cross-examination Drebes testified he keeps keys to the house and garage hidden on a light pole outside. The keys were in their hiding place after the break-in. Drebes said he was acquainted with Billy Hart and Lee Robbins. The latter boy had visited one of Drebes' sons in his home.

Investigating Officer Chris Dolbere testified there was no forced entry to Drebes' home or garage. No fingerprints were taken at the crime scene. An officer found the missing jewelry box alongside a road in rural Hull. None of the other missing items had been recovered.

Defendant presented an alibi defense. Page Carlen testified she was with defendant at her home from 5:30 or 6 p.m. until 10:30 p.m. on July 31, 1987, while he worked on Vicki Brown's car. Carlen said her husband Mike came home from work about 7 p.m. with his friend Mark Teuscher and the two men helped defendant with the car repairs. Carlen said she left the house briefly at 10:30 p.m. When she returned around 11 p.m., defendant and Teuscher were gone. Her husband indicated defendant and Teuscher left together. The witness did not see Robbins or Hart that evening.

David Will testified he had known defendant for between one and two years. Will recounted that he, defendant, and another man were barhopping in Quincy from about 10:30 or 11 p.m. on July 31, 1987, until 5 or 6 a.m. Will could not remember the name of the man with defendant, but was certain it was not Hart. He denied purchasing merchandise from defendant or Hart at any time. Will admitted on direct examination he had two prior convictions, one for cocaine possession and another for insurance fraud.

The defendant, testifying on his own behalf, said that from about 5:30 p.m. to 10:30 or 11 p.m. on July 31, 1987, he worked on a car belonging to Vicki Brown (his girlfriend), which was stalled at Page Carlen's house. Mike Carlen and Mark Teuscher joined him around 7 p.m. After the work on the car was complete, defendant said he and Teuscher drove to Quincy. Defendant explained that Mark Teuscher did not testify because he was at a seminar in Arkansas. According to defendant, he and Teuscher were in Quincy with David Will until the bars closed. They spent the night in Hannibal at Teuscher's house and returned to Hull the next day around noon. Defendant denied any in-

volvement in the Drebes break-in. Defendant admitted he had known Hart and Robbins for about one year, but denied seeing them on or about July 31, 1987.

Vicki Brown testified she had known defendant for two years and had lived with him most of that time. She said she was with defendant on July 31, 1987, until about 5 p.m. when he went to Carlen's to work on her car. Brown talked to defendant on the phone between 10:30 p.m. and 12 midnight while he was at the Carlens. The next time she saw him was the following day when Mark Teuscher brought him home around 2 or 3 p.m.

Brown said she was acquainted with Lee Robbins. She remembered seeing him on March 5, 1988, at Anita Boren's apartment. He was talking with a group of people, which included a woman named Helene Lovell. When Brown left the room she overheard Robbins say that, although the defendant was not involved in the burglary, they had to have someone to blame and the defendant was handy.

Robbins was recalled to the stand and admitted being present and conversing with Bobbie Boren, Helene Lovell and some others at Boren's apartment on March 5, 1988. He explained the conversation as follows. Brown apparently entered the apartment briefly and told Lovell she would be subpoenaed to testify at defendant's trial. Lovell was worried that if she were subpoenaed, she would also be questioned about a break-in at the Dunker cabin. Robbins explained that he, Hart, and Lovell had entered the unoccupied Dunker cabin, but did not steal anything. Robbins admitted he assured Lovell the Dunker break-in would not be mentioned at defendant's trial because defendant had not been involved in that incident. However, Robbins denied telling the women defendant was not involved in the Drebes break-in.

Barbara (Bobbie) Boren testified she was at her sister's apartment on March 5, 1988, with Lee Robbins, Helene Lovell and some others. According to Boren, Vicki Brown entered the apartment briefly and then stood outside the door. Boren heard Robbins say defendant was not involved in any burglaries, but they blamed defendant because he was handy. On cross-examination Boren admitted she thought it was strange for Robbins to state he and Hart needed someone to pin the robbery on when they had already admitted their involvement in the crime.

Helene Lovell testified she was present at the Boren apartment on March 5, 1988, but had no memory of any conversations that took place.

The trial judge read the jury the instructions before it retired to

deliberate. The instructions were recorded but not transcribed. The judge said "I'm going to ask [the bailiff] to take the jury to the jury room to begin their deliberations. I'm going to send the instructions along in just a minute." After dismissing the alternate juror, the judge informed counsel he had discovered the final paragraph of the issue instruction on burglary had been omitted from the written instruction, People's instruction No. 18A. The State's Attorney then discovered part of the issue instruction on theft dealing with exertion of unauthorized control over the stolen items had also been omitted from the written instruction, People's instruction No. 19A. The trial judge caught and corrected the error in instruction No. 18A as he was instructing the jury; however, the error as to instruction No. 19A was not detected until after the jury was orally instructed. The court requested that counsel prepare corrected instructions.

The record on appeal reveals that at 5:08 p.m. the jury was returned to the courtroom and the court read it the corrected instructions. The jury retired again at 5:15 p.m. without any written instructions. A statement by defendant's trial counsel, Elizabeth Miller, contained in the record on appeal indicates that when the bailiff took the jury instructions to the jury room, one of the jurors said: "It doesn't make any difference, we have already reached our decision." Thirty-five minutes later, at 5:50 p.m., the jury returned a verdict of guilty on all three counts and orders of judgment were entered on the verdict.

Defendant was sentenced on May 3, 1988, to four years' incarceration in the Department of Corrections, ordered to pay $20 to the violent crime victims assistance fund, and given credit for time served. At the sentencing hearing, the trial court merged the judgments on all three counts for purpose of sentencing, because the court opined all of the offenses arose out of one physical act. The State's Attorney agreed. The record reflects the judgment order was not amended to note the merger of the residential burglary and burglary counts.

Notice of appeal was filed on May 18, 1988. On June 6, 1988, defendant filed a motion for a continuance to file a post-trial motion. The trial court allowed the motion. On July 6, 1988, defendant filed a motion to withdraw his appeal in order to file a post-trial motion. His post-trial motion filed the same day alleged in part the trial court erred in submitting the cause to the jury without written instructions. The record reflects neither hearings nor rulings on either the post-trial motion or the motion to withdraw the notice of appeal.

The defendant first contends that the foregoing evidence was insufficient for the jury to find him guilty beyond a reasonable doubt of

residential burglary, burglary, and theft. Defendant argues he is entitled to a new trial (1) because the accomplice testimony was highly suspect and was impeached at trial and (2) because he presented a reliable alibi defense. Defendant notes the only testimony linking him to the crime was that of the alleged accomplices. He contends Hart and Robbins are not believable because they admittedly gave partially false written statements to the police regarding the Drebes break-in.

The State acknowledges the written statements of Hart and Robbins varied from the stories they told on the witness stand. However, it accurately points out both versions of the event implicate defendant. Hart's written statement related defendant's involvement in the crime; the variation in his trial testimony goes only to the date of the sale of the stolen merchandise. Robbins' written statement varied from his trial testimony only to the extent of defendant's participation in the break-in. The written statement said defendant actually entered the house and removed items, while Robbins' trial testimony indicated defendant acted only as a lookout and was not physically present in the dwelling.

In addition, defendant contends Hart and Robbins were motivated to unify their stories for trial in order to get lenient treatment as juveniles for their involvement in the Drebes break-in. Both young men had been charged in the Drebes case as well as nine other break-ins that occurred in the area during the summer of 1987. Defendant contends that for their cooperation in this case, Hart and Robbins were leniently sentenced to only two years' juvenile probation, given a curfew, and ordered to pay restitution. Nevertheless, both young men testified the stories they told the jury were true. The State maintains the trial testimony of Hart and Robbins is reliable because they both knew the disposition of their own cases by the time they took the stand at defendant's trial. Any motivation they might have had to falsely implicate defendant had been defused.

Finally, defendant argues the testimony of Brown and Boren severely impeaches that of Robbins and supports the contention both boys falsely implicated defendant in the Drebes break-in. Brown testified she overheard Robbins telling a group of women on March 5, 1988, it was handy to blame defendant for the crime, even though he was uninvolved. Defendant maintains Boren corroborated Brown's testimony when she related she was a participant in the conversation in which Robbins made the statement Brown overheard. However, Robbins denied making a statement in the presence of Boren which exculpated defendant. Again the State argues it is unlikely Robbins would have told Boren and the others he and Hart needed to pin the

Drebes break-in on defendant, when Hart and Robbins had already admitted their individual involvement in that crime via written statements.

The State gives little weight to defendant's alibi because it was provided by his live-in girlfriend Brown and her close friends, Boren and Carlen. Brown and Carlen's testimony only accounted for defendant's whereabouts from between 5 p.m. and about 11 p.m. on July 31, 1987. The State contends a reasonable juror could have believed the crimes were committed after defendant's contact with the alibi witnesses. In light of the fact Hart named David Will as the purchaser of stolen merchandise belonging to Drebes, the State contends Will's alibi testimony he was with defendant from around 10:30 p.m. July 31, 1987, until 6 a.m. the next day is not reliable because Will could not be expected to implicate himself.

■■■ A criminal conviction will not be disturbed on appeal unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of guilt. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267.) Despite the suspicion inherent in accomplice testimony (*People v. Baynes* (1981), 88 Ill. 2d 225, 430 N.E.2d 1070), the fact the State's key witnesses in this case were defendant's alleged accomplices goes only to the weight of the evidence. Whether their testimony formed a sufficient basis for the conviction was for the jury to decide. (*People v. Page* (1987), 163 Ill. App. 3d 959, 516 N.E.2d 1371; *People v. Farnsley* (1973), 53 Ill. 2d 537, 293 N.E.2d 600.) In assessing whether the evidence is sufficient to sustain a conviction, this court must not retry the defendant. Rather " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Collins*, 106 Ill. 2d at 261, 478 N.E.2d at 277, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; see also *People v. Timmons* (1983), 114 Ill. App. 3d 861, 449 N.E.2d 1366.

■■■ Defendant presented a substantial defense in this case. However, in view of the foregoing principles we cannot conclude the evidence presented by the State is insufficient to support the jury's verdict. Conflicting testimony alone does not establish a reasonable doubt of guilt. It is the trial court's duty to resolve any conflicts in the evidence (*People v. Kubat* (1983), 94 Ill. 2d 437, 447 N.E.2d 247) and to assess the credibility of witnesses. (*People v. Ellis* (1978), 74 Ill. 2d 489, 384 N.E.2d 331; *Collins*, 106 Ill. 2d 237, 478 N.E.2d 267;

*People v. Cool* (1962), 26 Ill. 2d 255, 186 N.E.2d 254; *People v. Jacquith* (1984), 129 Ill. App. 3d 107, 472 N.E.2d 107.) By and large the outcome of this case depended on the credibility of the witnesses and the weight accorded their testimony by the jury. Where the defendant's fate depends on the credibility of witnesses with conflicting testimony, the finding of the trial court or jury should not be disturbed on review. Absent reasonable doubt of defendant's guilt clearly reflected by the record on appeal, the fact finder's determination will be given great weight. (*People v. Server* (1986), 148 Ill. App. 3d 888, 499 N.E.2d 1019, *appeal denied* (1987), 114 Ill. 2d 555, 508 N.E.2d 734, *cert. denied* (1987), 484 U.S. 842, 98 L. Ed. 2d 88, 108 S. Ct. 131.) Here, when viewed in a favorable light, the State's evidence is not so improbable or unsatisfactory that a reasonable doubt as to defendant's guilt remains. *People v. Williams* (1982), 93 Ill. 2d 309, 444 N.E.2d 136; *People v. Gharst* (1984), 122 Ill. App. 3d 1, 460 N.E.2d 813.

Defendant next contends the trial court committed plain error when it allowed the jury to deliberate for slightly more than one-half hour without the benefit of instructions. In order to decide this question, a detailed recitation of the jury instruction procedure followed by the trial court is necessary.

At the conclusion of closing arguments, the trial judge read the prepared jury instructions to the jury. The reading of these instructions was recorded, but not transcribed. The trial judge then asked the bailiff to take the jury to the jury room to begin deliberations. The trial judge indicated he would "send the instructions along in just a minute." Immediately after the jury retired at 4:33 p.m. the following colloquy occurred between the trial judge and the State's Attorney:

> "THE COURT: On Instruction No. 18A, I saw as I was reading the instructions that the second or the last paragraph was not given. That last paragraph says that ***, paraphrasing, if you find any one of the propositions has not been proved, you should find the Defendant not guilty. Now, as I was reading these, when I noticed that, I went ahead and read that paragraph from one of the other instructions; but we do need to change the instructions we send back to the jury. You need to add that paragraph to the instructions. I'll give you the original instructions, and you have it typed and you let me know when I can give the instructions to the Bailiff. Does anyone else have anything else to say at this time?
>
> MR. SHAW: Your Honor, the only other thing, on 19A,

\*\*\*—It looks like, the second paragraph, that instruction was inadvertently omitted. Second paragraph deals with the exerting unauthorized control. Paragraph one talks about the owner. Next paragraph talks about depriving, but the exertion of unauthorized control is omitted.

\* \* \*

\*\*\* I don't believe that was read. I didn't notice it until after the instruction was given.

THE COURT: You're saying that when I read the instructions I left out a paragraph?

MR. SHAW: No. It was left out in the instruction that was typed up, and I didn't catch it.

\* \* \*

THE COURT: \*\*\* Let's look at 19A. What was the problem with 19A?

MR. SHAW: The first paragraph deals with who's the owner. Second paragraph deals with the fact that the Defendant is alleged to have exerted unauthorized control over the items, and the third paragraph deals with the intent of the Defendant to permanently deprive the owner of the use of the benefit of the property.

I think the instructions as they were originally typed made references to who the owner of the items [were] and the fact that the Defendant intended to deprive permanently of the use, but it left out the second paragraph dealing with exertion of unauthorized control over the items.

THE COURT: Okay, so you've presented another instruction, and I'm going to call this 19B, this new instruction."

After another minor error was discovered in instruction No. 18, the court withdrew prepared instructions Nos. 18 and 19, which it had marked instructions Nos. 18A and 19A, and substituted instructions Nos. 18B and 19B, which were the instructions on the issues of burglary and theft. See Illinois Pattern Jury Instructions, Criminal, Nos. 14.10, 13.02A, at 117, 107 (2d ed. Supp. 1987).

At 5:08 p.m., the jury was brought back into the courtroom and was read the corrected instructions. The trial judge told the jury he would give them a complete set of written instructions, all of which would be correct. The bailiff was instructed to take the corrected instructions to the jury room along with the jury. The jury retired anew at 5:15 p.m. In her statement contained in the record on appeal, defense attorney Elizabeth Miller reported that when the bailiff took the instructions to the jury room door, knocked, and said he had the in-

structions, one of the jurors was heard to say, "It doesn't make any difference, we have already reached our decision." At 5:50 p.m. the jury returned a verdict of guilty on all three counts.

Defendant complains it was error for the trial court (1) to misstate the law of theft by reading instruction No. 19A to the jury before deliberations and (2) to allow the jury to deliberate from 4:33 p.m. to 5:08 p.m. without the benefit of written instructions. The State argues the defendant's failure to object at trial to the manner in which the jury was instructed constituted waiver of that issue on appeal despite the fact defendant raised such an objection in his post-trial motion for a new trial.

Final judgment was entered against defendant on May 11, 1988, and defendant filed his notice of appeal on May 18, 1988. On June 6, 1988, the trial court allowed defendant's motion for an additional 45 days to file his post-trial motions. Defendant filed his motion for a new trial on July 6, 1988, along with a motion to withdraw his notice of appeal. The record on appeal was filed with this court on July 20, 1988, and on August 15, 1988, the trial court denied defendant's motion to withdraw the notice of appeal. No ruling was made on the post-trial motion for a new trial. The State does not object that the latter motion was untimely made, even though the trial court issued an order subsequent to defendant's filing of his notice of appeal allowing him an additional 45 days to file.

■ It is a fundamental rule of law in Illinois that the proper filing of a notice of appeal causes the jurisdiction of the reviewing court to attach *instanter* and concomitantly deprives the trial court of jurisdiction of the cause, except as to purely ministerial matters. (*Daley v. Laurie* (1985), 106 Ill. 2d 33, 476 N.E.2d 419; *People v. Bradley* (1984), 129 Ill. App. 3d 177, 472 N.E.2d 480.) Arguably the trial court in this case lacked jurisdiction to hear and decide defendant's motion to extend the time for filing his post-trial motions. (See *Daley*, 106 Ill. 2d at 38, 476 N.E.2d at 422 (trial judge without jurisdiction to grant motion for new trial after notice of appeal filed).) However, a resolution of the questions whether the trial court had jurisdiction to grant such an extension and thus whether the motion was timely made would not be determinative of the central issue in this case, which is whether defendant has waived any objection to the jury instruction procedures.

■ Recently the supreme court in *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124, *cert. denied* (1988), ___ U.S. ___, 102 L. Ed. 2d 263, 109 S. Ct. 274, declared that absent plain error, both a trial objection and a written post-trial motion raising the issue are

necessary to reserve a question on appeal. Supreme Court Rule 615(a) provides, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." 107 Ill. 2d R. 615(a).

It is undisputed this defendant failed to object to instruction No. 19A at the instruction conference. Generally, such inaction constitutes a waiver of any impropriety regardless of whether the objection was raised in a post-trial motion. (*People v. Tannenbaum* (1980), 82 Ill. 2d 177, 415 N.E.2d 1027; *People v. Roberts* (1979), 75 Ill. 2d 1, 387 N.E.2d 331; *Aspland v. McMaster* (1963), 39 Ill. App. 2d 366, 188 N.E.2d 508.) However, "substantial defects are not waived by failure to make timely objections thereto if the interests of justice require." (107 Ill. 2d R. 451(c).) Supreme Court Rule 451(c) further provides that "[i]nstructions in criminal cases shall be tendered, settled, and given in accordance with section 2—1107 of the Code of Civil Procedure." (107 Ill. 2d R. 451(c).) Section 2—1107 states:

"(a) The court shall give instructions to the jury only in writing, unless the parties agree otherwise, and only as to the law of the case. ***

(b) The original written instructions given by the court to the jury shall be taken by the jury to the jury room, and shall be returned by the jury with its verdict into court." Ill. Rev. Stat. 1987, ch. 110, par. 2—1107.

With *Enoch* and the supreme court rules in mind, the question becomes whether it was plain error for the jury to deliberate after having been inaccurately instructed orally and without having before it written instructions delineating the elements of the crime with which the defendant was charged.

It is the trial court's burden to insure the jury is given the essential instructions as to the elements of the crime charged, the presumption of innocence, and the question of burden of proof. (*People v. Parks* (1976), 65 Ill. 2d 132, 137, 357 N.E.2d 487, 489; *Roberts*, 75 Ill. 2d at 13, 387 N.E.2d at 337.) In *People v. Ogunsola* (1981), 87 Ill. 2d 216, 429 N.E.2d 861, the supreme court held fundamental fairness, for purposes of the waiver rule in criminal cases, requires the trial court to give correct instructions on the elements of the offense in order to insure a fair determination of the case by the jury. Failure to so instruct the jury constitutes plain error.

In *People v. Lewis* (1969), 112 Ill. App. 2d 1, 250 N.E.2d 812, the court held as follows:

"In order that the jury not be left to its own speculation or improvisation, it is essential that it be correctly and fully in-

structed by the court concerning the elements of the crime charged ***.

* * *

*** [I]t [is] a fundamental responsibility of the court to see to it that the jury not be permitted to deliberate defendant's guilt or innocence of the crime charged without being told the essential characteristics of that crime." *Lewis*, 112 Ill. App. 2d at 8, 11, 250 N.E.2d at 816, 817-18.

In *Lewis*, a jury instruction was tendered that lacked an essential element of the crime charged. Here, immediately after the jury retired to deliberate, the State's Attorney discovered the error in instruction No. 19A before it was ever physically tendered to the jury. The record indicates the erroneous instructions were promptly and properly cured by the trial court as soon as the oversights were discovered. The jury did not actually see the erroneous instructions. In fact, the jury did not have the benefit of written instructions at all until after it was orally instructed a second time. The jury was allowed to deliberate from 4:33 p.m. to 5:08 p.m. without any written instructions whatsoever.

Defendant contends it was plain error for the court to read instruction No. 19A to the jury when it misstated the law of theft. The instruction as read omitted the proposition that defendant knowingly exerted unauthorized control over the stolen items. Defendant argues he was deprived of a fair trial by the trial court's failure to properly instruct the jury orally as to the elements of the crime, coupled with the jury's partial deliberation without jury instructions.

The State concedes proposed instruction No. 19A as it was read to the jury lacked the language which declared the jury had to find defendant exerted unauthorized control over the stolen property before it could find him guilty of theft. However, it argues the error in the oral instruction was quickly cured by corrected oral and written instructions. The State notes the jury reconvened and deliberated from 5:15 p.m. to 5:50 p.m. before reaching a verdict. According to the State, no reversible error was committed when the court conscientiously corrected the mistake and the jury had the opportunity to deliberate for a reasonable amount of time with proper written instructions.

Defendant cites several opinions in which convictions were overturned when the jury based its decision on instructions that misstated or omitted an essential element of the offense charged. (*People v. Stromblad* (1978), 74 Ill. 2d 35, 383 N.E.2d 969; *People v. Friedman* (1986), 144 Ill. App. 3d 895, 494 N.E.2d 760.) The State argues the

cases cited are distinguishable from this case, because here the written instructions the jury received were proper and the mistakes in instruction No. 19A given orally were promptly corrected.

■■■ We agree the case law is distinguishable, but believe the reasoning behind the reversals in cases where improper instructions were tendered is applicable to cases such as this where the instructions were not tendered until after the jury had begun deliberation. The function of the instructions is to convey to the jurors the correct principles of law applicable to the facts so that they can arrive at a correct conclusion according to the law and the evidence. (*People v. Morgan* (1987), 152 Ill. App. 3d 97, 504 N.E.2d 172, *cert. denied* (1987), 484 U.S. 866, 98 L. Ed. 2d 141, 108 S. Ct. 189.) Although we have already declared the evidence presented by the State was sufficient to prove defendant's guilt beyond a reasonable doubt, we find it significant to this issue defendant presented a substantial alibi defense to the jury. The relative closeness of the evidence compels us to carefully scrutinize the instruction procedure below.

■■■ We know the jury was orally instructed such that an essential element of the offense of theft was omitted. Subsequently the fact finder was allowed to deliberate for more than one-half hour without jury instructions to guide it. The total deliberation time was 72 minutes, thus, the jury was erroneously "left to its own speculation and improvisation" (*Lewis*, 112 Ill. App. 2d at 8, 250 N.E.2d at 816) for the first half hour of its deliberations. This error is compounded by the fact the only evidence of guilt came from Hart and Robbins. In order to fairly weigh the testimony of those men against the testimony of the alibi witnesses, the jury should have had before it the written accomplice instruction. On these facts we consider it plain error for the jury to have also been deprived, for any amount of time, of the essential instructions that would have explained the elements of the crimes charged, the presumption of innocence, and the burden of proof.

We note there is some indication in the record on appeal that the jury concluded defendant was guilty before it examined the written jury instructions. Without placing undue emphasis on that fact, we find the other factors, *i.e.*, improper oral instruction, partial deliberation without written instructions, and the presentation of a substantial defense, combine to constitute plain error in the instruction of the jury in this case. Fundamental fairness and the "interests of justice" require that defendant be awarded a new trial.

Since we have reversed defendant's conviction on the basis of plain error, it is not necessary to consider defendant's alternate argu-

ment that he was deprived of effective assistance of counsel. Defendant's final argument on appeal regarding the need to vacate his burglary conviction is also rendered moot by our order to reverse and remand this case.

The error in instructing the jury requires the judgment of the circuit court of Pike County be reversed and remanded.

Reversed and remanded.

LUND and GREEN, JJ., concur.